209-06/MEU
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
GENERAL NATIONAL MARITIME
TRANSPORT COMPANY
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 (fax)

Michael E. Unger (MU 0045)
Jan P. Gisholt (JG 3768)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

06 CIV. 3534 (LTS)

------------------------------------------------------------x

GENERAL NATIONAL MARITIME
TRANSPORT COMPANY,

**ECF CASE**

                                    Plaintiff,

**DECLARATION OF
FENELLA TOOKEY IN
SUPPORT OF PLAINTIFF'S
MOTION TO RECOGNIZE
AND ENFORCE ARBITRAL
AWARD**

        -against-

COMPAGNIE ALGERO-LIBYENNE DE
TRANSPORT MARITIME (CALTRAM),

                                    Defendant.

------------------------------------------------------------x

      FENELLA TOOKEY, pursuant to Section 1746 of Title 28 of the United States

Code, hereby declares and says the following under penalty of perjury:

      1.     I am a solicitor of the Supreme Court of England and Wales and am a

solicitor with the law firm of Mills & Co., which has a registered office at Milburn

House, Dean Street, Newcastle Upon Tyne NE1 1LE, United Kingdom. I have

responsibility for the day-to-day conduct of the case under the supervision of a partner,

Michael Smith.

      2.     Mills & Co. and its predecessor firm, Rayfield Mills, represented Plaintiff

GENERAL NATIONAL MARITIME TRANSPORT COMPANY ("GNMTC") in

respect of a London arbitration proceeding against Defendant COMPAGNIE ALGERO-

NYDOCS1/288851.3

LIBYENNE DE TRANSPORT MARITIME ("CALTRAM"). I am fully familiar with the facts and circumstances of the dispute between the parties, the arbitration between the parties, and all of the proceedings between the parties to date. I am fully authorized to make this Declaration on GNMTC's behalf in support of its application to recognize and enforce the London arbitral award that was issued in its favor and against CALTRAM as a Judgment of this Court.

3.    Insofar as the contents of this Declaration are within my own knowledge they are true. Insofar as the contents of this Declaration are not within my own direct knowledge, they are true to the best of my information and belief.

4.    The dispute between GNMTC and Defendant CALTRAM arose under a maritime contract of charter party which required the parties to submit all disputes to arbitration at London. I hereby certify that a true and correct copy of the Charter, which was originally signed by both parties, is annexed hereto as Ex. 1. The written agreement to arbitrate is found at Clause 45(b) of the Charter.

5.    CALTRAM owed to GNMTC outstanding charter hire as well as indemnity for a cargo damage claim arising under the Charter.

6.    Despite due demand, CALTRAM refused or otherwise failed to pay GNMTC the amounts due and owing.

7.    On June 23, 2007, GNMTC commenced arbitration by appointing David Farrington as arbitrator in accordance with London Maritime Arbitrators Association ("LMAA") Terms (2006).

8.    On July 17, 2006, Defendant CALTRAM agreed to the appointment of David Farrington as sole arbitrator.

9.      Both parties were represented by legal counsel throughout the London arbitral proceedings and presented their submissions to the arbitrator.

10.     Ultimately, an arbitral award (the "Award") was rendered in favor of GNMTC and against CALTRAM on June 7, 2007. I hereby certify that a true and correct copy of that Award is annexed hereto as Ex. 2.

11.     The Award directed CALTRAM to pay GNMTC as follows:

(a)     The sum of $275,252.36 (Two Hundred Seventy Five Thousand Two Hundred Fifty Two United States Dollars and Thirty Six Cents) together with interest on that sum from 16th April 2005 at the annual rate of 6.75% compounded every three months until payment;

(b)     Interest on the sum of $66,611.89 from 16th April 2005 at the annual rate of 6.50% compounded every three months until 25th October 2006;

(c)     The sum of €37,500 (Thirty Seven Thousand Five Hundred Euros) together with interest on that sum from 24th October 2006 at the annual rate of 5.00% compounded every three months until payment.

12.     The Award further awarded GNMTC the cost of the Award itself (i.e., the arbitrator's fees) together with interest on the sum paid together with interest at the rate of 7.75% per annum compounded every three months from the date of payment until the date of reimbursement.  GNMTC paid the cost of the Award itself, £4,800.00 (Four Thousand Eight Hundred Pounds Sterling), payment of which was acknowledged by the sole arbitrator on June 14, 2007.

13.     The Award also granted GNMTC its legal costs (i.e., attorneys' fees and disbursements) in connection with the arbitration (to be paid by CALTRAM) and reserved to the arbitrator the power to assess these recoverable costs.

14.     A Final Award on Costs ( the "Costs Award") was rendered in favor of GNMTC and against CALTRAM on January 30, 2008.  I hereby certify that a true and correct copy of that Final Award on Costs is annexed hereto as Ex. 3.

15.     The Costs Award directed CALTRAM to pay GNMTC as follows:

(a)     GNMTC's recoverable costs and disbursements of the Award dated June 7, 2007 in the agreed sum of £12,903.57 (Twelve Thousand Nine Hundred Three Pounds Sterling and Fifty-Seven Pence) together with interest at the annual rate of 8.25% compounded every three months from June 7, 2007 until payment.

(b)     GNMTC's recoverable costs of the Application for the Costs Award in the sum of £862.00 (Eight Hundred Sixty-Two Pounds Sterling) together with interest at the annual rate of 8.25% compounded every three months from October 30, 2007 until payment.

(c)     Reimbursement of the costs of the Costs Award (i.e., the arbitrator's fees) in the sum of £375.00 (Three Hundred Seventy-Five Pounds Sterling) together with interest at the annual rate of 8.25% compounded every three months from the date of payment by GNMTC until the date of payment by CALTRAM.  GNMTC paid the cost of the Final Award on Costs, which was acknowledged by the sole arbitrator on January 30, 2008.

16.     CALTRAM has been provided a copy of the Award and the Costs Award, and GNMTC has repeatedly demanded payment for the amounts due thereunder, but

CALTRAM, in bad faith, has refused or otherwise failed to make any payment against the Award.

17. Both the Award and the Costs Award are final and conclusive between the parties.

18. The United Kingdom is a party to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The New York Convention provides that upon supplying certified copies of the agreement to arbitrate and the arbitral award, a court in a nation that is party to the New York Convention must recognize and enforce that award as a domestic judgment, if it is made timely, and if none of the few reasons designated in the Convention for non-recognition are present.

19. This application is timely as it is made well within the time period permitted under the New York Convention, and it is respectfully submitted that none of the designated reasons listed in the Convention can in good faith be raised here by CALTRAM. CALTRAM has not appealed either the Award or the Costs Award and both are final and capable of enforcement.

20. Accordingly, recognition and enforcement of the Award and Costs Award rendered in London by the arbitral tribunal should be had, and the Award and Costs Award should be made a Judgment of this Court.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Newcastle Upon Tyne, UK
      February 13, 2008

                                             *Fenella Tookey*

                                                Fenella Tookey

Exhibit 1

B 1.8

Code Name: "NYPE 93"
Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

0068



# TIME CHARTER©

New York Produce Exchange Form

*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

| | |
|---|---|
| THIS CHARTER PARTY, made and concluded in **TRIPOLI** | 1 |
| this ..................................day of **SEPTEMBER** .........................19.. **2004** | 2 |
| Between.......**GENERAL NATIONAL MARITIME TRANSPORT COMPANY** | 3 |
| | 4 |
| Owners of the Vessel described below, and.....**CALTRAM — TRIPOLI/LIBYA** | 5 |
| | 6 |
| | 7 |
| **Charterers.** | 8 |
| | |
| **Description of Vessel** | 9 |
| | |
| Name.....**JAREF**...............**BENGHAZI**...... Flag ....**LIBYAN**..... Built ....**1987**....(year). | 10 |
| Port and number of Registry ............................................................ | 11 |
| Classed.....**NKK**............................. in ............................................ | 12 |
| Deadweight......**9612**................long*/metric* tons (cargo and bunkers, including freshwater and **753**** | 13 |
| stores not exceeding ........................ long*/metric* tons) on a salt water draft of ................... | 14 |
| on summer freeboard. | 15 |
| Capacity.....**15719.37**..........cubic feet grain.......**14748.01**.........cubic feet bale space. | 16 |
| Tonnage.....**8195**.................**14** ....... GT/GRT. | 17 |
| Speed about .....**3**............ knots, fully laden, in good weather conditions up to and including maximum | 18 |
| Force .....**MAX 4** on the Beaufort wind scale, on a consumption of about ...................... long*/metric* | 19 |
| tons of.....**MDO**.......................................... | 20 |

* Delete as appropriate. — 21
For further description see Appendix "A" (if applicable) — 22

## 1:    Duration

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period — 24
of.....**ABT 40 DAYS ( FORTY DAYS )**.................................................................. — 25



0067

...................................................................................................................... 32
...........................................................................The Vessel on her delivery 33
shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted 34
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear 35
simultaneously. 36

The Owners shall give the Charterers not less than ...........**three**...............days notice of expected date of 37
delivery. 38

**3.** **On-Off Hire Survey** 39

....ior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their 40
respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct 41
joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition 42
of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without 43
prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree. 44
If either party fails to have a representative attend the survey and sign the joint survey report, such party 45
shall nevertheless be bound for all purposes by the findings in any report prepared by the other party. 46
On-hire survey shall be on Charterers' time and off-hire survey on Owners' time. 47

**4.** **Dangerous Cargo/Cargo Exclusions** 48

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, 49
injurious, flammable or corrosive nature unless carried in accordance with the requirements or 50
recommendations of the competent authorities of the country of the Vessel's registry and of ports of 51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must 52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically 53
~~cluded: livestock of any description, arms, ammunition, explosives nuclear and radioactive materials~~/ 54
~~ALL BULK /CARGOES / NETHIDES / BAUXITE /ALUMINUM NOT BELOW SPECIFICATION/~~ 54
~~ALUMINIA / AMMUNITIONS / EXPLOSIVES / SCRAP/ SULPHUR IN BULK/ v OTOR~~ 55
~~SPIRIT/ DIRECT IRON ORE REDUCED PELLETS/ CREOSOTED GOODS/FERROSILICON.~~ 56
~~CALCIUM HYPOCHLORIDE/ CALCIUM CARBIDE/ BLACKPOWDER/ LOADED BOMBS~~ 57
~~BLASTING CAPS/ SALT/ PETROLEUM AND ITS PRODUCTS/ ZINC ASHES/ ASBESTOS~~ 58
~~CAUSTIC SODA/ BULK BORAX/ BONE MEAL/ PITCH IN BULK/TAROR OF ITS~~ 59
~~PRODUCTS IN BULK/MOTOR LOCKS/ TUMINS/ SHAVINGS/ PETCOKE/ LIVESTOCK~~ 60
~~SPONGE IRON/ FISHMEALS/ ASPHALT IN DRUMS/ BITUMEN/IN DRUMS/ ACIDS/~~ 61
~~TOXIC AMMONIUM NITRATE IN BAGES/ DANGEROUS INFLAMMABLE CARGOES/~~ 62
~~INJURIOUSCARGOES/ RESINS/ RADIO ACTIVE WASTE/ RAWPALM AND LOGS/TITANIUM~~ 63
~~SLAG (Incl. chloride) ANTALUSITE/ ALL HARMFUL ILLEGAL MERCHANDIZE~~ 64

(b) ~~If IMO classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~........................... tons and the Charterers shall provide the Master~~ with any evidence he may 66
~~reasonably require to show that the cargo is packaged, labelled,~~ loaded and stowed in accordance with IMO 67
~~regulations, failing which the Master~~ is entitled to refuse such cargo or, if already loaded, to unload it at 68
~~the Charterers' risk and expense.~~ 69



0056

73
.......................................................................................................................................................excluding
74
75
..................................................................................................................as the Charterers shall direct.
76

### 6.    Owners to Provide

77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for    78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for    79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the    80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and    81
equipment for and during the service, and have a full complement of officers and crew.    82

### 7.    Charterers to Provide

83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise    84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory    85
garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages,    86
towages, agencies, commissions, consular charges (except those pertaining to individual crew members    87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel    88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all    89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew    90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while    91
the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations    92
shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six    93
months or more.    94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a    95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard    96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in    97
their time.    98

### 8.    Performance of Voyages

99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance    100
with the Vessel's crew. The Master shall be conversant with the English language and (although    101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards    102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to    103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk    104
and expense, under the supervision of the Master.    105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or    106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if    107
necessary, make a change in the appointments.    108

0065

**9.  Bunkers**                                                                                    109

(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and      110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with:      111
.................................. long**/metric** tons of fuel oil at the price of **LIBYAN MARKET** per ton;      112
................................tons of diesel oil at the price **MDO** **LIBYAN MARKET** per ton. The vessel shall      113
be redelivered with: ............................ tons of fuel oil at the price of....**LIBYAN MARKET**..... per ton;      114
................................, tons of diesel oil at the price of ...**LIBYAN MARKET**... per ton.      115

\* *Same tons apply throughout this clause.*      116

(b)  The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and      117
auxiliaries and which conform to the specification(s) as set out in Appendix A.      118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines      119
and the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed      120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed      121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners      122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker      123
consumption, nor for any time lost and any other consequences.      124

**10.  Rate of Hire/Redelivery Areas and Notices**      125

                                                                          **7.700.—**

The Charterers shall pay for the use and hire of the said Vessel at the rate of $..................................      126
U.S. currency, daily, or $................................ U.S. currency per ton on the Vessel's total deadweight      127
carrying capacity, including bunkers and stores, on ............................... summer freeboard, per 30 days,      128
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part      129
of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition,      130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at................................      131
.....................................................................................................................................      132
.....................................................................................................................................      133
.................................................................. unless otherwise mutually agreed.      134

                                                                          **7**

The Charterers shall give the Owners not less than ....................... days notice of the Vessel's      135
expected date and probable port of redelivery.      136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be      137
adjusted to GMT.      138

**11.  Hire Payment**      139

(a)  *Payment*      140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in      141
........................................................................., viz.................................................................      142
.....................................................................................................................................      143
.....................................................................................................................................      144



.............................................................. currency, or in United States Currency, in funds available to the    146
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate    147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day    148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,    149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to    150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)    151
may otherwise have on the Charterers.    152

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the    153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold    154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever    155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire    156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the    157
Charterers' account.    158

**(b)**    _Grace Period_    159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors    160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners    161
..5..... clear banking days (as recognized at the agreed place of payment) written notice to rectify the    162
failure, and when so rectified within those ..5....... days following the Owners' notice, the payment shall    163
stand as regular and punctual.    164

Failure by the Charterers to pay the hire within ....2..... days of their receiving the Owners' notice as    165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.    166

**(c)**    _Last Hire Payment_    167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate    168
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and    169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking    170
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for    171
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the    172
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be    173
refunded by the Owners or paid by the Charterers, as the case may be.    174

**(d)**    _Cash Advances_    175

~~Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required~~    176
by the Owners, subject to 2½ percent commission and such advances shall be deducted from the hire.    177
~~The Charterers, however, shall in no way be responsible for the application of such advances.~~    178

**12.**    **Berths**    179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that    180

8063

### 13.   Spaces Available                                                                  183

(a)  The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can    184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the    185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,    186
apparel, furniture, provisions, stores and fuel.                                              187

(b)  In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the    188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a    189
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.    190

### 14.   Supercargo and Meals                                                              191

~~The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'~~    192
~~risk and~~ see that voyages are performed with due despatch.  He ~~is to be~~ furnished with free    193
accommodation and same fare as provided for the Master's ~~table~~, the Charterers paying at the rate of    194
.................. per day.  The ~~Owners shall~~ victual pilots and customs officers, and also, when    195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,    196
~~Charterers paying at the rate of ................................ per meal for all such victualling.~~    197

### 15.   Sailing Orders and Logs                                                           198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing    199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine    200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the    201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,    202
showing the course of the Vessel, distance run and the consumption of bunkers.  Any log extracts    203
required by the Charterers shall be in the English language.                                  204

### Delivery/Cancelling                                                                      205

If required by the Charterers, time shall not commence before ........**20th Sept. 2004**..........., and should the    206
Vessel not be ready for delivery on or before...............**20th Sept. 2004**...........but not later than...*A.8*...hours,    207
the Charterers shall have the option of cancelling this Charter Party.                        208

### Extension of Cancelling                                                                  209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready    210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty    211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is    212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will    213
cancel the Charter Party.  Should the Charterers elect not to cancel, or should they fail to reply within two    214
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date    215
of readiness for delivery as notified by the Owners shall replace the original cancelling date.  Should the    216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers    217

8062

### 17.    Off Hire
219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency    220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the    221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,    222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless    223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or    224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of    225
hire and overtime, if any, shall cease for the time thereby lost.  Should the Vessel deviate or put back    226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident    227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time    228
of her deviating or putting back until she is again in the same or equidistant position from the destination    229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'    230
account.  In the event of the Vessel being driven into port or to anchorage through stress of weather,    231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses    232
resulting from such detention shall be for the Charterers' account.  If upon the voyage the speed be    233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and    234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be    235
deducted from the hire.    236

### 18.    Sublet
237

~~Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of~~    238
~~the time covered by this Charter Party, but the Charterers remain~~ responsible for the fulfillment of this    239
~~Charter Party.~~    240

### 19.    Drydocking
241

The Vessel was last drydocked ............... **NOV. 2003.** ................................................................................    242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~    243
at a convenient time and place, to be ~~mutually agreed upon between~~ the Owners and the Charterers, for    244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~    245

*(b)  Except in case of emergency no drydocking shall take place during the currency of this Charter    246
Party.    247

* Delete as appropriate
248

### 20.    Total Loss
249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or    250
being last heard of) shall be returned to the Charterers at once.    251

### 21.    Exceptions
252

**22.    Liberties**                                                                                      006‡‡

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels    257
in distress, and to deviate for the purpose of saving life and property.                                      258

**23.    Liens**                                                                                          259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due      260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on   261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be    262
returned at once.                                                                                          263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,   264
which might have priority over the title and interest of the Owners in the Vessel. The Charterers          265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries   266
services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.     267

**24.    Salvage**                                                                                        268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting        269
Owners' and Charterers' expenses and crew's proportion.                                                   270

**25.    General Average**                                                                                271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any           272
subsequent modification thereof, in ..................................... and settled in ...........................    273
currency.                                                                                                  274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will   275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules   276
1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason             277
Clause" as per Clause 31.                                                                                  278

Time charter hire shall not contribute to general average.                                                 279

**26.    Navigation**                                                                                     280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners      281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,    282
and all other matters, same as when trading for their own account.                                         283

**27.    Cargo Claims**                                                                                   284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club   285
New York Produce Exchange Agreement of February 1970, as amended May. 1984, or any subsequent            286

0060

28. **Cargo Gear and Lights**                                                                288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows:.......................... 289
.................................................................................................................................... 290
.............**AS DESCRIBED   IN VSL'S PARTICULARS**.................................... 291
.................................................................................................................................... 292
providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also  293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall  294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If  295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the  296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or  297
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that  298
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned  299
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If  300
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which  301
case the Vessel shall remain on hire.                                                         302

29. **Crew Overtime**                                                                         303

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~ 304
the Charterers shall pay the Owners, ~~concurrently with the hire~~..........................................per month 305
~~or pro rata.~~                                                                             306

30. **Bills of Lading**                                                                      307

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates  308
or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the  309
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts. 310

(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall  311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency  312
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master  313
at their request.                                                                            314

(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and  315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for  316
any loss, damage, expense or delay howsoever caused."                                        317

31. **Protective Clauses**                                                                   318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of  319
lading or waybills issued hereunder:                                                         320

(a)    CLAUSE PARAMOUNT                                                                      321
This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the  322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national  323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall  324



0059

carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said     326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such     327
term shall be void to that extent, but no further."     328

and     329

(b)    BOTH-TO-BLAME COLLISION CLAUSE     330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any     331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in     332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against     333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents     334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other     335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the     336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.     337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or     338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or     339
contact."     340

and     341

(c)    NEW JASON CLAUSE     342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage     343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the     344
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,     345
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the     346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,     347
and shall pay salvage and special charges incurred in respect of the goods.     348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship     349
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover     350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,     351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."     352

and     353

(d)    U.S. TRADE - DRUG CLAUSE     354
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the     355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested     356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.     357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences     358
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel     359
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made     360
against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,     361
as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account     362
and the Vessel shall remain on hire.     363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this 384
clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable 365
time the Vessel is released and at their expense put up the bails to secure release of the Vessel. 366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the 367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the 368
Vessel's personnel." 369

and 370

(e)   WAR CLAUSES 371
"(i)  No contraband of war shall be shipped.  The Vessel shall not be required, without the consent of the 372
Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state 373
of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration 374
of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture, 375
seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de 376
facto authority or any purported governmental organization maintaining naval, military or air forces). 377

(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring 378
the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not 379
exceeding a valuation of..............................................In addition, the Owners may purchase and the 380
Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, 381
total loss, blocking and trapping, etc.  If such insurance is not obtainable commercially or through a 382
government program, the Vessel shall not be required to enter or remain at any such port or zone. 383

(iii)  In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, 384
or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such 385
port or zone assume the provable additional cost of wages and insurance properly incurred in connection 386
with master, officers and crew as a consequence of such war, warlike operations or hostilities. 387

(iv)  Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the 388
Charterers' account." 389

32.   War Cancellation 390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or 391
more of the following countries:............................................................................................ 392
............................................................................................................................................ 393
............................................................................................................................................ 394
............................................................................................................................................ 395
either the Owners or the Charterers may cancel this Charter Party.  Whereupon, the Charterers shall 396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after 397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near 398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she 399
then is;  or, if at sea, at a near open and safe port as directed by the Owners.  In all cases hire shall 400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this 401
Charter Party shall apply until redelivery. 402

0057

**33.    Ice**

403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging. Subject to the Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her size, construction and ice class.

404
405
406
407
408
409

**34.    Requisition**

410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. The period during which the Vessel is on requisition to the said government shall count as part of the period provided or in this Charter Party.

411
412
413
414
415

If the period of requisition exceeds .....**7  DAYS**................ months, either party shall have the option of cancelling this Charter Party and no consequential claim may be made by either party.

416
417

**35.    Stevedore Damage**

418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

419
420
421
422
423

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society.

424
425
426
427

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.

428
429
430
431
432

**36.    Cleaning of Holds**

433

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by local regulations, at the rate of.....**USD  500**............. per hold.

434
435
436

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver

437
438

**37.   Taxes**                                                                             440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners    441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter    442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding    443
taxes levied by the country of the flag of the Vessel or the Owners).                       444


**38.   Charterers' Colors**                                                                445

~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~   446
own markings.  The Vessel shall be repainted in the Owners' colors ~~before termination~~ of the Charter    447
Party.  Cost and time of painting, ~~maintaining~~ and repainting those changes effected by the Charterers    448
~~shall be for the Charterers' account.~~                                                   449


**39.   Laid Up Returns**                                                                   450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their    451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum    452
period of 30 days if on full hire for this period or pro rata for the time actually on hire.    453


**40.   Documentation**                                                                     454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the    455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial    456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'    457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate    458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.    459


**41.   Stowaways**                                                                         460

(a)     (i)  The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining    461
        access to the Vessel by means of secreting away in the goods and/or containers shipped by the    462
        Charterers.                                                                        463

        (ii)  If, despite the exercise of due care and diligence by the Charterers, stowaways have gained    464
        access to the Vessel by means of secreting away in the goods and/or containers shipped by the    465
        Charterers, this shall amount to breach of charter for the consequences of which the Charterers    466
        shall be liable and shall hold the Owners harmless and shall keep them indemnified against all    467
        claims whatsoever which may arise and be made against them.  Furthermore, all time lost and all    468
        expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account    469
        and the Vessel shall remain on hire.                                               470

        (iii)  Should the Vessel be arrested as a result of the Charterers' breach of charter according to    471
        sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a    472
        reasonable time, the Vessel is released and at their expense put up bail to secure release of the    473



(b)    (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained 475
access to the Vessel by means other than secreting away in the goods and/or containers shipped 476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including 477
fines, shall be for the Owners' account and the Vessel shall be off hire. 478

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel 479
by means other than secreting away in the goods and/or containers shipped by the Charterers, 480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel 481
is released and at their expense put up bail to secure release of the Vessel. 482

## 42.    Smuggling     483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any 484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof. 485

## 43.    Commissions     486

A commission of ........................ percent is payable by the Vessel and the Owners to ........................ 487
........................................................................................................................................... 488
........................................................................................................................................... 489
........................................................................................................................................... 490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter. 491

## 44.    Address Commission     492

An address commission of ........................ percent is payable to ........................ 493
........................................................................................................................................... 494
........................................................................................................................................... 495
on hire earned and paid under this Charter. 496

## 45.    Arbitration     497

(a)    NEW YORK     498
All disputes arising out of this contract shall be arbitrated at New York in the following manner, and 499
subject to U.S. Law: 500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their 501
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this 502
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with 503
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of 504
Maritime Arbitrators Inc. 505

For disputes where the total amount claimed by either party does not exceed US $ ........................ ** 506
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society 507
of Maritime Arbitrators Inc. 508



(b)     LONDON

All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder
shall be governed by English Law.

For disputes where the total amount claimed by either party does not exceed US $ .......................**
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime
Arbitrators Association.

* Delete para (a) or (b) as appropriate

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions
of this clause shall have full force and remain in effect.

~~If mutually agreed, clauses ............... to ..............., both inclusive, as attached hereto are fully
incorporated in this Charter Party.~~

**1- OTHER TERMS & CONDITIONS AS PER FIXTURE RECAP DATED. 11/09/2004**

APPENDIX "A"                                                                525

11th Sept, 2004

To Charter Party dated GENERAL NATIONAL MARITIME TRANSPORT CO. GNMTC ..................... 526
Between ....CALTRAM – TRIPOLI ................................................................ Owners  527
and ............................................................................................ Charterers  528

Further details of the Vessel:                                             529

                                                                            530

MR. FERRAH MOHAMED                          COMMERCIAL DEPT.

CALTRAM – TRIPOLI                            GNMTC





0053

### ADENDUM N.O 02/2004 TO CHARTER PARTY OF MV JAREF
### DATED 11/09/2004

0070

Today the following has been mutually agreed between :
Messer. General National Maritime Transport company Tripoli – Libya
As " owners of MV Jaref. "

And

Messer. Algerian Libyan Company For Maritime Transport Tripoli – Libya
As " charterers "

That, Mv Jaref to perform in direct continuation of the present period, an additional time charter period of about 30 days on the following basis:

- Daily hire USD 8350.- per day prorate.
- Trading limits to include Angola and Congo only.
- Charterers P&I club to issue official guarantee letter to owners confirming that they will not risk subject vessel or her crew in any unsafe trading ports, berths or areas during the time charter period, and will be responsible for all and any perils which may arise during vessel's trade and will reimburse accordingly.
- Redelivery of subject vessel is to remain as per CP dated 11/09/2004 ( 1SPB LIBYA )
- Charters to pay cash bonus of USD 300.- per each crew member out of daily hire.
- All other terms and conditions to remain unchanged as per CP dated 11/09/2004.

Tripoli – Libya
12/12/2004

G N M T C
As Owners

CALTRAM
As Charterers

Exhibit 2

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:

**GENERAL NATIONAL MARITIME TRANSPORT COMPANY of Tripoli**

**Claimants (Owners)**

**and**

**CALTRAM of Tripoli**

**Respondents (Charterers)**

m/v "Jaref"

Timecharter dated 11th September 2004

-------------------------------
**FIRST FINAL AWARD**
-------------------------------

WHEREAS

1. By a charterparty dated 11th September 2004 on an amended New York Produce Exchange 1993 form and evidenced by a fixture recap of the same date ("the Charterparty") it was agreed between the General National Maritime Transport Company as Owners ("the Claimants") and Caltram as Charterers ("the Respondents") that the Claimants would let and the Respondents would hire the Claimants' vessel "Jaref" ("the vessel") on the terms and conditions therein appearing. By two Addenda nod 02/2004 dated 12th December 2004 and nod 03/2005 dated 12th January 2005 it was agreed that the vessel would perform in direct continuation two additional time charter trips.

1

2. Clause 45(b) of the Charterparty provided that all disputes arising were to be arbitrated in London and that any dispute should be governed by English law. Disputes having arisen between the parties, on 23rd June 2006 the Claimants appointed me, David Farrington, of Chorley Farm House, West Wycombe, Buckinghamshire HP14 4BS as Arbitrator. On 17th July 2006 the Respondents concurred in my appointment so that the parties agreed that I was Sole Arbitrator. I accepted appointment on LMAA Terms (2006). The seat of the arbitration is England.

3. The disputes referred to me as Arbitrator were claims by the Claimants for payment of the balance of a final hire statement in the amount of US$347,211.26 which was subsequently reduced to US$292,624.00. The Claimants also sought an indemnity in the amount of €37,500 under the provisions of the Inter-Club New York Produce Exchange Agreement in respect of a cargo claim arising from alleged damage to cacoa discharged at Ambarli in March 2005 ("the cargo claim"). The Claimants also claimed interest and costs. The Charterers admitted liability for US$66,611.89 under the final hire statement but in all other respects denied liability. They also claimed by way of deduction or set-off the amounts of (a) US$78,000 which they said represented loss of earnings consequent upon the Claimants' refusal to load additional cargo at Izmir, and (b) $73,500 for agency fees.

4. Each party was represented by its respective solicitors. They made written submissions, supported by appropriate documentation, and had the opportunity to read and comment upon the opposing party's submissions. My Reasons are attached to this Award and form part of it. This First Final Award is final as to the matter which it decides but is interim in the reference.

NOW I, **DAVID FARRINGTON**, having taken upon myself the burden of this reference and having carefully and conscientiously considered the evidence and

2

submissions of the parties, **DO MAKE AND PUBLISH THIS MY INTERIM FINAL AWARD** as follows:

(A) **I HOLD AND FIND** that:

    (1)  the claim for the balance of the final hire statement succeeds in the amount of US$275,252.36 and no more.

    (2)  The Claimants are entitled to an indemnity in the amount of €37,500 in respect of the cargo claim.

    (3)  The Respondents' claims by way of deduction or set-off for US$78,000 and $73,500 are hereby dismissed.

(A) **I AWARD AND ADJUDGE** that the Respondents will pay to the Claimants

    (1)  the sum of US$275,252.36 (Two Hundred Seventy Five Thousand Two Hundred Fifty Two United States Dollars and Thirty Six Cents) together with interest on that sum from 16th April 2005 at the annual rate of 6.75% compounded every three months until payment.

    (2)  Interest on the sum of US$66,611.89 from 16th April 2005 at the annual rate of 6.50% compounded every three months until 25th October 2006.

    (3)  The sum of €37,500 (Thirty Seven Thousand Five Hundred Euros) together with interest on that sum from 24th October 2006 at the annual rate of 5.00% compounded every three months until payment.

(A) **I FURTHER AWARD AND ADJUDGE** that the Respondents will bear their own and also pay the recoverable legal costs of the Claimants on the standard basis, and **I RESERVE** to myself power to assess such recoverable costs.

3

(B) **I FURTHER AWARD AND ADJUDGE** that the Respondents will pay the costs of this First Final Award, always provided that if the Claimants have in the first instance paid any sum in respect of the costs of this First Final Award they shall be entitled to immediate reimbursement from the Respondents for the sum so paid together with interest at 7.75% per annum compounded every three months from the date of payment until the date of reimbursement.

GIVEN under my hand this 7ᵗʰ day of June 2007

David Farrington                          Witness

4

m/v "Jaref"

### Timecharter dated 11th September 2004

**REASONS FOR AND FORMING PART OF THE FIRST FINAL AWARD**

1.  By a Timecharter dated 11th September 2004 on an amended New York
    Produce Exchange 1993 Form and evidenced by a fixture recap of the same
    date ("the Charterparty") it was agreed between the Claimants, General
    National Maritime Transport Company of Tripoli ("the Claimants"), as
    owners and the Respondents, Caltram (Algerian Libyan Company for
    Maritime Transport) of Tripoli as charterers ("the Respondents") that the
    Claimants would let and the Respondents would hire the Claimants' vessel,
    the Jaref ("the vessel"), for a period of about 40 days. Hire at the rate of
    US$7,700 per day was to be paid every 15 days in advance.

2.  By an Addendum No 02/2004 dated 12th December 2004, it was agreed
    between the parties that the vessel would perform in direct continuation an
    additional time charter trip of about 30 days at the rate of hire of $8,350 per
    day. By a further Addendum No 03/2005 dated 12 January 2005, it was
    agreed that the vessel would perform in direct continuation an additional time
    charter trip of about 50 days at the rate of $8,000 per day. Each of the
    Addenda provided that all other terms and conditions of the Charterparty were
    to remain unchanged.

3.  The vessel was delivered into time charter service at 1300 hours GMT on 21st September 2004. According to the Respondents the vessel was redelivered by them at 1300 on 23rd March 2005, whereas the Claimants said that redelivery was at 1700 on 30th March. The Claimants sought payment of the balance of a final hire statement in the amount of $347,211.26 which during the course of the reference was revised to $292,624.00. They also claimed an indemnity in respect of an amount (subsequently quantified at €37,500) due to them from the Respondents under clause 27 of the Charterparty in respect of a cargo claim arising from alleged damage to a cargo of cacoa which had been discharged at Ambarli in March 2005. Clause 27 provided that cargo claims were to be settled between the parties in accordance with the Inter-Club New York Produce Exchange Agreement ("the Interclub Agreement").

4.  The Respondents on 9th October 2006 admitted liability for $66,611.89 on the basis of their own final hire statement and subsequently paid that sum. The Respondents denied that they were liable to the Claimants for all other amounts including the claim which had been brought under the Interclub Agreement. Included in the Respondents' final hire statement were two substantial amounts which were shown as credits: (a) $78,000 which, the Respondents said, represented loss of earnings due to the Master's alleged refusal to load a cargo at Izmir and (b) $73,500 for agency fees for a period of 182.96 days.

5.   Before turning to the detailed items which were in dispute between the
parties, it is necessary first to decide the terms of the Charterparty itself.
There was a dispute as to the extent to which, if at all, the standard printed
provisions of clause 7 of the NYPE Form had been amended. The Claimants'
position was that the clause had not been amended. They relied upon the
fixture recap and also a signed copy of the Charterparty. The Respondents'
position was that clause 7 had been amended by the deletion of the words
"*compulsory watchmen*" and "*compulsory garbage disposal*" in lines 85 and
86 and also by the deletion of the words "*agencies, commissions, consular
charges*" in line 87. The Respondents, too, produced in evidence a signed
copy of the Charterparty which included those amendments. For ease of
reference I refer to the proposed deletions as "the alleged amendments".

6.   The Respondents said that the alleged amendments relating to agencies were
necessary. The thrust of their submission was that as a result of sanctions
imposed by the United States of America the Claimants did not have overseas
agents; the Claimants had, therefore, requested the Respondents to arrange
and pay agents. The Respondents also relied upon a letter dated 23rd
September 2004 which, they said, Mr Ferrah (a senior employee) had written
to the Claimants. The effect of the letter was to amend clause 7 of the
Charterparty. The letter was in evidence. It had allegedly been signed on
behalf of the Claimants by way of receipt. Its validity was contested by the
Claimants. The Respondents also relied upon certain other documentation
relating to expenses which, they submitted, supported their contention. The

7

effect of the alleged amendments was to move from the Respondents as charterers responsibility to provide and pay for those services which, but for the alleged amendments, they would be liable.

7.    The fixture recap was in evidence. It identified over a foolscap page or so what can loosely be described as the principal details (for example, the rate of hire, duration, and permitted cargoes) of the Charterparty. The fixture recap concluded with the words:-

> *"NYPE CP + LOGICAL AMENDMENT"*

I consider that the words "logical amendment" in this context mean that the standard form of NYPE charterparty was to be amended but only to the extent as was necessary to ensure that the principal details were fully and properly capable of being put into commercial effect. Thus, to take but one example, clause 4(a) of the standard form would need to be amended to reflect the parties' specific agreement on permitted cargoes. I observe, however, that the principal details made no specific mention of matters which became the subject of the alleged amendments. There is no need to imply a term that the alleged amendments were to be effected in any event. Given the contents of the relevant documents, I conclude that the parties did not agree prior to the fixing of the vessel that clause 7 of the NYPE Form should be amended as the Respondents suggest or at all. It could be said that the alleged amendments were, arguably, illogical in the context of a contract where the Respondents as charterers were able to control the ports to which the vessel was to be sent. Thus, if the vessel was sent to a port where there was a requirement that there

8

be compulsory watchmen, then that was a consequence of the Respondents as charterers ordering the vessel to that port. Logically, therefore, that was an incidence which the Respondents as charterers should bear. Similar criticisms can be made of the other alleged amendments.

8.  I also conclude that there was no agreement between the parties after the vessel had been fixed that clause 7 should be amended. The circumstances in which the letter dated 23rd September 2004 was said to have come into existence were, on the evidence, unsatisfactory for two reasons. First, it was a commercial fact that by the start of the charter period the American sanctions in respect of Libyan interests (which dated back to the time of President Reagan) had either been largely withdrawn or were no longer being effectively enforced. Second, a statement from Ibrahim Mokhtar Elzayat, an employee of the Claimants, indicated that his signature as recipient on the letter could not have been contemporaneous because he did not take up employment in the Claimants' administrative department (where all correspondence is received) until 5th January 2006. Unfortunately, the various explanations and evidence offered by the Respondents were not entirely consistent. They also totally failed to explain why for such an important item there had not been a formal agreement between the parties -- after all, such an agreement was made on two occasions when the duration of the charter period was extended by the Addenda. Accordingly, I hold that clause 7 of the NYPE Form was not amended. In consequence I further hold that the Respondents are not entitled to claim either directly or as a credit the sum of $73,500.00 as

9

agency fees. In the circumstances it is not necessary make a decision on the value of a substantial number of invoices and other documents which the Respondents produced very late in the reference and which they said supported their claim although, of course, they have all had to be read.

9.    I now turn to those figures in the Claimants' final hire statement which were contested by the Respondents. If a figure has not been contested, then I find that it is accepted. The Respondents' Solicitors, very helpfully, provided a detailed and systematic analysis of the Claimants' final hire statement. This set an approach which the Claimants' Solicitors followed. It has, therefore, made somewhat easier the task of resolving the differences on a number of items.

10.   The first item of which the Respondents made a complaint was for the sum of $29,617.00 which appeared in the Claimants' final hire statement but without any description. The Claimants' explanation was that the sum represented hire between the period from 1300 on 23rd March (when it was envisaged that the vessel might be redelivered) and 1700 hours on 30 March 2005 when the vessel was actually redelivered. The Respondents alleged that the vessel had been off-hire from 1445 on 23rd March until 1200 on 29th March because the Claimants had ordered the Master to close the hatches and suspend discharge operations. The Claimants, however, produced evidence to support their submission that the Master had been ordered to suspend discharge because on 23rd March hire of $423,365.22 (which they said was due on 15th March 2005)

10

remained unpaid and they, the Claimants, threatened to place a lien on the cargo unless the outstanding hire was paid. Meetings were held between the parties, in consequence of which the Respondents agreed to pay $209,815.00 within 10 days. As a result of that agreement by the Respondents, the Claimants gave orders for the vessel to permit discharge to resume.

11. I find that the Claimants did give orders at 1445 on 23rd March for discharge to be suspended and for the vessel's hatches to be closed. At that time the Respondents owed hire to the Claimants. I also find that a further instruction to recommence discharge was given at 1200 on 29th March because the Respondents had agreed to pay some of the outstanding hire. Clause 11(b) of the Charterparty provided for a "grace period" of five days to be given to the Respondents to rectify any failure to make a punctual or regular payment of hire. By clause 11(a) after the expiry of the grace period the Claimants were entitled to withhold performance of any or all of their obligations and hire was to continue to accrue. The evidence shows that that is what the Claimants did between 23rd and 29th March. I find no evidence to support the Respondents' allegation that no hire was to be paid beyond what they described as the vessel's "notional redelivery" date of 23rd March. The vessel, therefore, remained on-hire during the relevant period whilst discharge was suspended. The amount of $29,617.00 is, therefore, allowed to the Claimants.

12. I now turn to consider other, more detailed, points which the Respondents made, commencing with their Defence Submissions dated 15th January 2007.

There were three items at Bartin, Odessa and Casablanca for transport expenses in the amount of $883.87 which the Respondents said were for the Claimants' account. Vouchers were in evidence but unfortunately they provided only limited assistance in that the purposes of the various journeys were not given. However, it would be unusual for a vessel, upon putting into port, to incur no transport expenses whatever. There are a number of reasons for this, eg change of crew or the need for the Master to attend outside the port. Accordingly, I consider it is more likely that the transport expenses were incurred for the Claimants' benefit and the amount is, therefore, allowed in the Respondents' favour.

13. I disallow, however, the Respondents' claim for $11,229.00 in respect of garbage disposal at Bartin and Luanda because of the conclusion which I have reached earlier in these Reasons on the alleged amendments and, thereby, the terms of clause 7 of the Charterparty. I also disallow all claims totalling $37,000.00 made by the Respondents concerning alleged exchange rate losses during the period of the Charterparty. I have disallowed the claims for those losses for two reasons: first, there is no evidence in support and, second, the Respondents have not identified the breach of or clause in the Charterparty which would entitle the Respondents to make such a claim.

14. The Respondents seek a credit in respect of cash to Master of $2,688.60 at Casablanca. The Claimants' position was that the sum represented cash to Master and was in order to pay for the crew bonus for hold cleaning at

Ambarli-Kunport in Turkey on 9th March; they produced in evidence a receipt for $3,000.00 dated 9th March signed by the Master. By clause 36 of the Charterparty the Respondents were to provide and pay for cleaning of holds. However, the item appeared under the heading of "Casablanca" in the Claimants' final hire statement and the receipt was in a different amount from that of which the Respondents made complaint. I consider, therefore, that the Respondents should be given credit for that amount.

15. There was a further item of cash to Master at Luanda in the sum of $8,100.00. The amount was part of a composite sum of $15,880.00 of which $7,780.00 was identified on the relevant receipt (which had been signed by the Master) as "*cancelled provisions*". The Claimants accepted that the sum of $7,780.00 was for their account. The balance of $8,100.00 on the receipt was described as "*bonus*" but no further details were given. The Claimants said that the amount represented amounts paid to the crew for hold cleaning; in a later submission the amount was said to be for hold cleaning and cargo lashing. Unfortunately there was no evidence to support the Claimants' positions other than the word "bonus". Accordingly, on the evidence it is appropriate to give the Respondents credit for the sum of $8,100.00.

16. There were three items for fresh water at Libya, Pointe Noire and Luanda in the total amount of $5,315.10. The Respondents alleged that the fresh water was supplied and used as boiler water. It was, therefore, for the Claimants' account in accordance with clause 6 of the Charterparty. The Claimants said

that the water was required for the main engine; they submitted, however, that there was no evidence that the water was an owners' item because the relevant voucher did not specify that the water was for the boiler. However, the Claimants were not able to identify the purpose for which the Respondents were said to have required the water – a statement from an appropriate officer on the vessel might have assisted. Therefore, given that the vessel would in any event have a need for fresh water, and in the absence of any explanation that the Respondents themselves required such water for their own purposes, eg hold cleaning, the Respondents are to be given credit for these items at the three ports in the amount of $5,315.00. The fact that the particular voucher did not specifically mention boiler water is not really important because such vouchers from suppliers are regularly bereft of desired detail.

17. I also consider that the surveys undertaken on behalf of the Harbour Master at Pointe Noire are likely to have been in respect of an item for which the vessel was responsible. The Respondents should, therefore, be given credit for the amount of $384.17. As to bunkers in the amount of $4,841.00 ($14,546.00 minus $9,705.00 admitted by the Respondents) given the conclusion which I have reached under paragraph 11 above, it is the Respondents' responsibility to pay for the bunkers for the period between 1445 on 23rd March and 1200 on 29th March because the vessel remained on-hire. The Respondents' Defence in that respect is, therefore, rejected.

14

18. It should be noted in passing that the Claimants have agreed to adjust their final hire statement by the amounts of $6,329.00 in respect of an item at Odessa which they agreed that the Respondents had already paid plus $7,780.00 in respect of the cancelled provisions. However, the value of these concessions was more than offset by the Claimants' increased claim for hire for the period between 23rd and 30th March 2005. After taking into account all the credits which are permitted by these Reasons, there is due to the Claimants from the Respondents on the final hire statement the amount of $275,252.36. That amount is awarded.

19. The Claimants also sought €37,500 by way of reimbursement from the Respondents under the Interclub Agreement which was incorporated into the Charterparty by clause 27. The facts were that the vessel carried a cargo of cacao beans from San Pedro, Ivory Coast, to Istanbul under thirteen bills of lading dated February 2005. A cargo claim was presented by leading London claims consultants on behalf of the receivers in the amount of €85,364.01; the grounds were that there were slack bags, a shortage and wetting through condensation. The cargo claim was settled at €37,500 by the Claimants' P & I Club, the West of England. The bills of lading had been signed on behalf of the Master, thus invoking the liability of the Claimants as carriers.

20. The Claimants produced in evidence a Survey Report dated 17th May 2005 which had been prepared on their behalf by Metropole Maritime Trading of Istanbul. The Report stated that the wet damage was to be attributed to more

15

than one cause but the causes included condensation during the voyage and fumigation operations at Ambarli. That fumigation was required because of insects in the cargo; the hatches had to be closed for three days without ventilation. It was clear from the Report that although there had been substantial temperature changes between day and night during discharge, the ventilation system in the cargo holds had been operating successfully during the voyage. The Report found that the top tiers in the holds were wetted. However, it also said that the surveyors had not been able to inspect the ventilation channels in the stow because at the time of the attendance at the vessel discharge had been substantially completed. However, photographs attached to the Report showed that bags were touching the side shell plating which was evidence of inadequate protection between the bags of cargo and that plating. Further, from the few available photographs it was difficult to identify clear ventilation channels between some of the tiers in the stow.

21. Loading and stowing were the Respondents' responsibility under clause 8(a) of the Charterparty. It was common ground that clause 8(a) was unamended. The Respondents said that the vessel's ventilation logs showed fluctuating hold temperatures and that those fluctuations were responsible for the cargo not having been safely carried. On the evidence I am satisfied that the vessel's ventilation system worked properly and that the principal causes of the damage to the cargo were condensation which was attributable to the stowage and the need to fumigate. The Respondents also made a general allegation of unseaworthiness but no evidence or argument was advanced in support of that

allegation. It is, therefore, rejected. Accordingly, I find that the cargo damage arose out of the loading, stowage, discharge or other handling of the cargo within the meaning of clause 8(b) of the Interclub Agreement. I also find on the evidence that the negotiated settlement of €37,500 was reasonable in the circumstances of the case. Accordingly, I hold that the Respondents must reimburse the Claimants under the Interclub Agreement in the amount claimed, ie €37,500.

22.  The Respondents in their own final hire statement sought a deduction or claimed a credit from the Claimants of $78,000 for what they said was loss of earnings which they had allegedly suffered as a result of the Master's refusal to load a full and complete cargo at Izmir. It was said that the vessel had space to load a further 3,000 tonnes. Strictly speaking, therefore, the claim was one for breach of contract sounding in damages; it was not the type of claim which could be the subject of an automatic deduction from hire by virtue of any of the provisions of the Charterparty. The burden, therefore, was upon the Respondents (i) to show the breach of the Charterparty relied upon and (ii) the damages which it is alleged they suffered as a result of that breach.

23.  In their Defence Submissions dated 9th October 2006, the Respondents initially relied upon two messages from Mr Ferrah. Those messages stated the formal grounds of the claim but had no supporting documentation attached. Some contemporary and extraneous evidence emerged in a subsequent set of

17

submissions. There can be little doubt on the evidence produced by the Respondents that they received on an unspecified date a firm offer from a third party, who was not identified on the relevant document, to carry a cargo of 3,200 metric tonnes of bagged wheat and flour. However, the firm offer (the acceptance of which was not in evidence so, arguably, the Respondents did not actually contract) listed the load port as Piraeus or Volos, not Izmir. In fact the document was headed "EX GREECE/LIBYA". There was no evidence that that particular cargo was in fact the same as that which the Respondents alleged should have been loaded at Izmir. Although there were some very interesting submissions in which the parties focused on whether the vessel could in fact have loaded the cargo, either in no 3 hold tween deck or elsewhere, there was absolutely no evidence to show that the Respondents had cargo available at Izmir. Accordingly, the claim must fail for lack of evidence. Quite simply, the Respondents have failed to discharge the burden of proof.

24.  I calculate that the balance due to the Claimants on their final hire statement is in the sum of US$275,252.36. I have awarded interest on that amount from 16th April 2005, being two weeks or so after redelivery – there should have been ample opportunity during that period for the Respondents to have formed a realistic view of their potential liability to the Claimants. I have also awarded the Claimants €37,500 in respect of the claim under the Interclub Agreement. I award interest on that amount from 24th October 2006 (being the date upon which the cargo claim was paid by the West of England). I also

have awarded interest on the admitted sum of $66,611.89 from 16th April 2005 to 25th October 2006 which was approximately the date upon which the sum was paid. In each instance interest has been awarded at a rate and in a manner which is consistent with the practice in London maritime arbitration.

25.    With regard to costs, although the Respondents have succeeded on certain matters, it is clear that those matters are not substantial in the context of the claims and counterclaims advanced. They have succeeded on matters which by and large were accountancy items and comparatively straightforward. It is appropriate, therefore, for the Claimants to recover their legal costs on the standard basis, and I reserve to myself jurisdiction to assess those costs. The Respondents will also pay the costs of the Award.

26.    Finally, the Award is final as to the matters which it decides. It is, however, only interim in the reference. On 17th April 2007 the Respondents' solicitors indicated what they described as a "new claim" – given the provisions of paragraph 10 of the LMAA Terms (2006), which govern the reference, I have jurisdiction to determine that claim.

........................................

Exhibit 3



# DAVID FARRINGTON

Chorley Farm House, West Wycombe, Buckinghamshire HP14 4BS
**Tel:** 44 (0) 1494 558285 **Fax:** 44 (0) 1494 510957 **E-mail:** df@chorleyfarm.co.uk

L.M.A.A.

30 January 2008

No. of pages: 1

**To:**  Mills & Co                          Ref: FT/11449/clw

    **No.**  0191 233 2220

**To:**  Bentleys                         Ref: ODS/DCP/C00161.9/cs

    **No.**  020 7481 7978

---

This communication is intended only for use by the Addressee. It may contain confidential or privileged information. If you receive this communication unintentionally, please inform me immediately and destroy the copy in your possession. Thank you.

---

### "Jaref"; cp dd 11.09.04

I have today published my Final Award on Costs. The fees on the Award are £375.00 and I have already received a cheque for that amount from Mills & Co, for which I thank them. The Award is being sent to each firm under cover of a copy of this fax.

Best wishes.

David Farrington

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**

**GENERAL NATIONAL MARITIME TRANSPORT COMPANY of Tripoli**

**Claimants (Owners)**

**and**

**CALTRAM of Tripoli**

**Respondents (Charterers)**

**m/v "Jaref"; charterparty dated 11th September 2004**

---

**FINAL AWARD ON COSTS**

---

**WHEREAS**

1. By a First Final Award dated 7th June 2007 I, David Farrington, as sole Arbitrator, awarded and adjudged that the Respondents shall pay to the Claimants (a) the sum of US$275,252.36 together with interest, (b) interest on the sum of $66,611.89 and (c) the sum of €37,500  together with interest. I further awarded and adjudged that the Respondents should pay the Claimants' recoverable costs of the Arbitration, to be determined on the standard basis if not agreed. I reserved to myself power to assess such recoverable costs.

2. By section 63 of the Arbitration Act 1996 I have power to determine by award the amount and basis of such recoverable costs.

3. The Claimants made an Application on 25th September 2007 for an award that their recoverable costs and disbursements of the First Final Award be assessed in the sum claimed of £17,417.92 including disbursements. The Claimants also sought their costs of the assessment in the sum of £862.00. They sent to the Respondents a copy of the Application, to which was attached an itemised Schedule of Costs containing details, including hourly rates, of the costs and expenses which the Claimants sought to recover by virtue of the First Final Award.

4. The Respondents submitted Points of Dispute on 30th October in which they conceded liability for £12,903.57 as the Claimants' recoverable costs of the First Final Award. On 14th January 2008 the Claimants accepted the said sum of £12,903.57 and asked that they also be awarded the costs of the assessment as claimed. The Respondents made no submissions in respect of those costs.

**NOW I**, DAVID FARRINGTON, having carefully and conscientiously considered the evidence and arguments submitted to me, DO MAKE AND PUBLISH this my FINAL AWARD ON COSTS.

(A) **I ASSESS** the Claimants' recoverable costs and disbursements of the First Final Award dated 7th June 2007 in the agreed sum of £12,903.57.

(B) **I FURTHER ASSESS** the Claimants' recoverable costs of the Application for this Costs Award in the sum of £862.00.

(C) **I AWARD AND ADJUDGE** that the Respondents will pay to the Claimants the sum of £13,765.57 (Thirteen Thousand Seven Hundred and Sixty Five Pounds Sterling and Fifty Seven Pence) together with interest (i) on £12,903.57

2

at the annual rate of 8.25% compounded every three months from 7th June 2007 until payment and (ii) on £862.00 at the annual rate of 8.25% compounded every three months from 30th October 2007 until payment.

(D) **I AWARD AND ADJUDGE** that the Respondents do pay the costs of this Award which **I HEREBY FIX** at £375.00, provided always that if the Claimants have in the first instance paid any sum in respect of the said costs they shall be entitled to immediate reimbursement by the Respondents of the sums so paid. together with interest thereon at the annual rate of 8.25% compounded every three months from the date of payment by the Claimants until the date of payment by the Respondents.

GIVEN under my hand in London this 30 day of January 2008

.......................................
David Farrington

.......................................
Witness

3